528 F.2d 414
 Mary E. JONES, Appellant,
v.
The PITT COUNTY BOARD OF EDUCATION, a public body corporate
of Pitt County, North Carolina, and Arthur S.
Alford, Superintendent of the Pitt
County Board of Education
Public Schools, Appellees.
 No. 74--2257.
 United States Court of Appeals,
Fourth Circuit.
 Argued May 8, 1975.
Decided Nov. 19, 1975.
 
 Charles L. Becton, Chapel Hill, N.C. (J. LeVonne Chambers, Chambers, Stein, & Ferguson, Chapel Hill, N.C., on brief), for appellant.
 W. W. Speight, Greenville, N.C. (W. C. Brewer, Jr., Speight, Watson & Brewer, Greenville, N.C., on brief), for appellees.
 Before BOREMAN, Senior Circuit Judge, and CRAVEN and FIELD, Circuit Judges.
 FIELD, Circuit Judge:
 
 
 1
 In this action brought under 42 U.S.C. § 1983 the plaintiff sought damages and equitable relief, alleging that her employment as a teacher in the Pitt County School System was terminated because of her race and without according her a due process hearing. The defendants moved for summary judgment which was granted by the district court on the due process issue.[1] The court, however, concluded that the equal protection issue required plenary consideration.
 
 
 2
 Upon the evidence presented by the parties the district court made detailed findings of fact which may be summarized as follows: The plaintiff who is a black school teacher began her teaching career in 1958. She had received a Bachelor of Science degree in Home Economics from North Carolina College in 1956 and was recertified to teach in 1958 when she received a Bachelor of Science degree in Education from Shaw University.[2] From 1960 until 1970 the plaintiff taught in the Pitt County School System for ten consecutive years at the W. H. Robinson School in Winterville, North Carolina, an all-black school.[3] Upon integration of the school system, she was assigned to teach the fifth grade in Pactolus Elementary School for the 1970--71 school year. Pactolus had previously been an all-white school.
 
 
 3
 During the 1970--71 school year Principal Bryant Tripp had occasion to observe the plaintiff's classroom conduct on three occasions. His overall ovaluation was that she was a weak teacher with particular difficulty in instruction and discipline. Tripp discussed these problems with the plaintiff and requested that she attend a Board of Education workshop to improve her teaching methods but she refused to do so. While Tripp later noted some improvement in discipline, he still regarded her performance as weak. On April 26, 1971, Tripp advised the plaintiff that he was dissatisfied with her performance, and his annual professional evaluation which was filed in May of 1971 reflected weaknesses in eight different categories.
 
 
 4
 During the 1970--71 school year the plaintiff's performance was also observed by Patsy S. James, a Supervisor in the School System. The overall evaluation of the plaintiff by Mrs. James was that she was a weak teacher, particularly in the areas of discipline and teaching methods. In appraising Mrs. James testimony, the district judge stated that while some of her evaluations were subjective in nature, the reasons given in support thereof were valid and impartial, and there was no indication of any racial discrimination or bias.
 
 
 5
 On April 22, 1971, Mr. Tripp gave an unfavorable report on the plaintiff to the Pactolus School Advisory Council and the Council voted not to recommend her for reemployment. The plaintiff was not reemployed by the Board of Education at the conclusion of that year. This action of the Board was made upon the recommendation of Superintendent Alford whose recommendation was based upon the evaluations of Tripp and Mrs. James as well as a review of the file and teaching record of the plaintiff. On May 27, 1971, Alford advised the plaintiff by letter that her contract would be terminated and advised her of her right to a hearing. On June 24, 1971, the plaintiff, together with her attorney, attended a hearing before the Pactolus School Advisory Council which was composed of six whites and three blacks. All of the members of the Council with the exception of one black were present at the meeting. The Council voted unanimously to reaffirm its prior decision not to recommend retention of the plaintiff. Thereafter, in July of 1971, the Board of Education afforded a hearing to the plaintiff and her counsel, and at the conclusion thereof unanimously decided not to reemploy her. Tripp and the Advisory Council recommended that a black teacher be hired to fill the vacancy created by the plaintiff's termination. Miss Grace Brown was employed in that position and was rated as a capable teacher during the 1971--72 school year. Miss Brown resigned and Ms. Ebron replaced her and also received excellent ratings in the position. Both Miss Brown and Ms. Ebron are black.
 
 
 6
 The district judge specifically found that the race of the plaintiff did not influence, Tripp, James and Alford in their evaluations of her teaching performance, nor did it play any part in the decision of the Board of Education. Based upon his subsidiary factual findings, the district judge concluded that the defendants had demonstrated by clear and convincing evidence that the discharge of the plaintiff was not racially motivated, and had established that the sole reason for the non-retention of the plaintiff was her professional incompetence. Upon this appeal the plaintiff contends that the record does not support this ultimate finding of the district court.
 
 
 7
 It is conceded that in its appraisal of the evidence the district court was well aware that the School Board was charged with 'the burden of justifying its conduct by clear and convincing evidence.'[4] This evidentiary standard has been described as 'that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal.'[5] The fact that this higher standard of proof was required of the defendants in the district court does not expand the scope of our appellate review,[6] however, and we are not at liberty to set aside the factual findings of the district court 'unless clearly erroneous'. Rule 52(a), Federal Rules of Civil Procedure. 'It is not enough that we might give the facts another construction, resolve the ambiguities differently, and find a more sinister cast to actions which the District Court apparently deemed innocent. * * * We are not given those choices, because our mandate is not to set aside findings of fact 'unless clearly erroneous." United States v. Real Estate Boards, 339 U.S. 485, 495, 70 S.Ct. 711, 717, 94 L.Ed. 1007 (1950).
 
 
 8
 Primarily the plaintiff challenges the evaluation reports of Tripp and James, contending that they were based upon subjective criteria and were internally inconsistent.[7] Counsel suggests than an analysis of each 'assigned reason' in the reports demonstrates that it was merely pretextual.[8] This insistence of plaintiff's counsel that we analyze the minutia of the various evaluations of the plaintiff's teaching performance would require us, in effect, to consider and decide the factual issues de novo. This, in our opinion, would require an excursion outside the appropriate limits of our appellate review which were stated by the Court in Zenith Corp. v. Hazeltine, 395 U.S. 100, 123, 89 S.Ct. 1562, 1576, 23 L.Ed.2d 129 (1969):
 
 
 9
 'In applying the clearly erroneous standard to the findings of a district court sitting without a jury, appellate courts must constantly have in mind that their function is not to decide factual issues de novo. The authority of an appellate court, when reviewing the findings of a judge as well as those of a jury, is circumscribed by the deference it must give to decisions of the trier of the fact, who is usually in a superior position to appraise and weigh the evidence.'
 
 
 10
 We recognize that we are not bound by the factual determinations of the district court merely because they are supported by substantial evidence,[9] and that a finding may be rejected as "clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). This does not mean, however, that we may substitute our judgment for that of the district court. This was recognized by Judge Sobeloff in Jersey Insurance Company of New York v. Heffron, 242 F.2d 136, 139 (4 Cir. 1957):
 
 
 11
 'While the Court of Appeals has broader powers in reviewing a District Judge's findings of fact than in reviewing the findings of a jury * * * it will not disturb his findings merely because it may doubt their correctness. It is required that the Court of Appeals be satisfied that the District Judge is clearly in error before it will set his findings aside.' (Citations omitted).
 
 
 12
 Upon our review of the record we cannot say that the district judge was clearly in error in his finding that the defendants had justified their conduct by clear and convincing evidence. Nor are we 'left with the definite and firm conviction that a mistake has been committed.' Accordingly, the judgment below is affirmed.
 
 
 13
 Affirmed.
 
 CRAVEN, Circuit Judge (dissenting):
 
 14
 I agree with my brothers that there is some evidence in the record tending to support the ultimate finding of the district court that Mary Jones was discharged because of incompetence. I also agree that we are bound by such a finding on appeal unless it is clearly erroneous. The point of disagreement is that I believe, and they do not, that in determining whether the finding below is clearly erroneous we must necessarily consider (a) the peculiar burden of proof on the School Board, and (b) we must look at the whole record and not simply a part of it.
 
 A. Burden of Proof
 
 15
 As the record clearly establishes, this is 'a school system with a history of segregation,' and such a history, plus the discharge of a disproportionately large number of black teachers incident to desegregation thrusts upon the School Board the burden of justifying its conduct by clear and convincing evidence, Keyes v. School District, 413 U.S. 189, 209, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). Indeed, the Pitt County schools were not integrated until implementation of a court ordered plan in 1970--71.
 
 
 16
 The district court held, and the majority agrees, that it could detect no racial animus motivating the discharge of Mary Jones. Neither do I discern any such animus, and that I do not should not be surprising. It is the very difficulty of proving wrongful motivation and purpose that occasioned this circuit to reverse the ordinary burden of proof and put it upon those 'having the power to produce the facts.' Chambers v. Board of Education, 364 F.2d 189, 192 (4th Cir. 1966). But mere reversal of the burden was thought to be an insufficient protection, and so the burden was not only turned around, but increased. The result amounts to a presumption of misconduct. If the evidence is evenly balanced, or even if a preponderance of it is on the side of School Board justification, the Board has failed to sustain its burden of justification by clear and convincing evidence. Keyes, supra. Moreover, it is 'not enough, of course, that the school authorities rely upon some allegedly logical, racially neutral explanation for their actions. Their burden is to adduce proof sufficient to support a finding that segregative intent was not among the factors that motivated their actions.' Keyes, supra, 413 U.S. at 210, 93 S.Ct. at 2698 (emphasis added). Whether the ultimate finding below is 'clearly erroneous' within the meaning of Rule 52(a) cannot be determined in a vacuum. In addition to looking at the record as a whole, to which I address myself below, an appellate court must also consider the applicable burden of proof in the district court, and if it is an unusual burden, we should 'keep these criteria in mind when reviewing findings of a trial judge' . . .. Soccodato v. Dulles, 96 U.S.App.D.C. 337, 226 F.2d 243, 247 (1955), petition for rehearing en banc denied (1955). In Soccodato, the Court of Appeals for the District of Columbia reversed a finding below that the petitioner had expatriated himself and was no longer an American citizen on the ground that the finding was based on a bare preponderance of the evidence whereas in expatriation cases the government has always been held to a strict degree of proof, usually being required to prove its case by clear, unequivocal and convincing evidence. It is in that context that the court held that it must keep those 'criteria in mind' when reviewing findings of a trial judge in expatriation cases, and the higher burden of proof was held to be decisive on the question of whether or not the finding below was clearly erroneous within the meaning of Rule 52(a).
 
 
 17
 In Esso Standard Oil Co. v. Sun Oil Co., 97 U.S.App.D.C. 154, 229 F.2d 37 (1956), cert. denied, 351 U.S. 973, 76 S.Ct. 1027, 100 L.Ed. 1491 (1956), the same circuit held that in determining whether the district court's findings of fact in patent and trademark cases were 'clearly erroneous' under Rule 52(a), the Court of Appeals must bear in mind that in patent cases a finding of fact by the Patent Office as to priority of invention or confusing similarity of marks must be accepted as controlling, unless the contrary is established by evidence 'which in character and amount carries thorough conviction.' The court noted that a mere preponderance of the evidence is not sufficient with regard to invention and that the Patent Office finding must be accepted if it is 'consistent with the evidence.' The findings of the district court were reversed as clearly erroneous, not because there was no evidence to support the finding, but because that evidence was not of sufficient quality and weight to produce 'thorough conviction.' See Moore, Federal Practice & Procedure, P52.03(1) n. 14.
 
 
 18
 I believe these cases are sensibly decided, and that they strongly suggest that in a school teacher case involving a history of discrimination this court must keep in mind the criteria of 'clear and convincing' evidence as we determine whether the finding below was clearly erroneous. To do otherwise is to abdicate appellate enforcement of the Keyes command.
 
 B. The Record as a Whole
 
 19
 My brothers decline to 'analyze the minutia of the various evaluations of the plaintiff's teaching performance' because to do so would amount to 'consider(ing) and decid(ing) the factual issues de novo.' Their refusal seems to me a failure to consider the record as a whole, something we are bound to do in every case, even when reviewing the expertise of administrative agencies. Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Looking at all the evidence, as I think we must, discloses the failure of the Board to sustain its heavy burden.
 
 
 20
 These are the salient facts, and they are, as I read the record, beyond dispute:
 
 
 21
 1. For three years since 1970--71 white teachers have been hired at a 6--1 ratio over blacks, and separation of teachers from the system has been 50--50 black and white, resulting in a disproportionate reduction in the black complement of teachers.
 
 
 22
 2. As long as Mary Jones taught at an all-black school there was no suggestion from anyone that she was incompetent.
 
 
 23
 3. When the court-ordered plan for integration was put into effect in 1970, Mary Jones was assigned to a previously all-white school. She also was not assigned to continue teaching in the seventh and eighth grades (with interim assignments at the high school level), but was assigned to teach the fifth grade in Pactolus Elementary School. During that first year in a wholly different and new assignment, Mrs. Jones was observed in class at various times, as the majority opinion recites, by Principal Tripp and Supervisor James, both white, and was rated 'weak' by both examiners.
 
 
 24
 4. The basis for discharge was Principal Tripp's PPE[1] rating Mary Jones weak in 11 out of 33 categories. The PPE was based upon TE's[2] prepared by Principal Tripp. It is conceptually impossible to accord the PPE greater weight than the underlying TE documentation upon which it rests. As shown in the composite chart in the Appendix, the TE's indicate that Mary Jones received only five weak scores out of a total of 165 ratings. Simply scanning the chart gives the impression that half of the ratings are above average and the rest average, except for some ungraded ones and the five weak marks already mentioned. It does not seem to me that five weak marks out of a possible 165 ratings can be said to be a demonstration by clear and convincing evidence of incompetence. It is significant, I think, that my brothers do not undertake to say so, preferring to ignore these facts as minutia the consideration of which would constitute de novo review.
 
 
 25
 5. No one has ever even suggested that this teacher is not competent to teach the seventh grade, which she had done some five years at the black school. Not even Principal Tripp recommended discharge. Instead, he steadily maintained she was a good seventh or eighth grade teacher, but weak in the fifth grade.
 
 
 26
 6. The only documentary evidence in the record supporting a conclusion of incompetency is Supervisor James' ratings, but there is nothing the record to show that Superintendent Alford even received James' report prior to his discharge letter. Moreover the Superintendent never referred to the James report but instead in his deposition said that he recommended nonretention 'based on Mr. Tripp's recommendation to me . . ..'
 
 
 27
 'The substantiality of evidence must take into account whatever in the record fairly detracts from its weight.' Universal Camera Corp. v. NLRB, supra at 488, 71 S.Ct. at 464.
 
 
 28
 I therefore think my brothers err when they base decision upon the subjective testimony of the Superintendent, the Supervisor, and the Principal, and fail and refuse to examine the teacher evaluation forms that are reproduced as an appendix to this dissenting opinion.
 
 
 29
 It seems to me that the Board's decision not to retain the plaintiff was largely subjective and wholly unsupported by the underlying documentation, and that the Board thus failed to sustain its heavy burden of adducing clear and convincing evidence of incompetence. I am convinced that the finding to the contrary is clearly erroneous and that a mistake has been committed.
 
 
 30
 APPENDIX
-------------------------------------------------------------------------------
 TE EVALUATIONS: Each column represents a seperate report
 ----------------------------
 CATEGORY 10/8/70 11/17/70 2/5/71 4/19/71 4/23/71
 ---------------------------- ------- -------- ------ ------- -------
 A. Personal Qualities
 1. Neatness and AA AA AA AA AA
 appropriateness of
 dress
 2. Courtesy and tact A/AA AA AA AA AA
 3. Self control and A/AA AA AA AA AA
 poise
 4. Voice--warm and A W AA NC 1 AA
 sincere -
 5. Dependability NC NC AA AA AA
 B. Classroom Environment
 1. Lighting, ventilation, A W AA AA AA
 heating -
 2. Seating and other NA A/AA AA AA AA
 arrangements
 3. Bulletin boards NA A A A/AA A
 used, current,
 appropriate
 4. Student behavior NA A A/MI A W
 satisfactory -
 C. Teaching Characteristics
 1. Is prompt in NC A A AA AA
 attendance and records
 2. Shows fairness, A A A AA NC
 impartiality, and
 patience in working
 with students
 3. Helps develop sound ?-A NC A ? W
 working habits -
 4. Provides for individual ?-A NC A ? ?
 differences
 5. Uses well-organized ?-A A A/MI ? ?
 plans
 6. Gives clear and A W A/MI ? ?
 adequate directions -
 7. Measures students' NC NC A ? NC
 progress effectively
 8. Sees that pupils NC NC A/MI ? ?
 consistently appraise
 their own work
 9. Stimulates participation N C A/MI NC ?
 in classroom
 discussions and
 activities by all
 pupils
 10. Maintains discipline ?-A A A NC 2 ?
 founded on respect,
 not fear
 11. Provides opportunities NC NC A W/A ?
 and materials for
 creative work
 12. Uses a well-balanced NC A A A NC
 variety of effective
 teaching techniques
 (e.g., project and unit
 work, demonstrations,
 audio-visual aids,
 bulletin
 and chalkboards,
 exhibit
 cases, field trips, and
 homework)
 13. Has thorough knowledge W/A A NC A A
 of subject matter
 14. Uses the English A A A AA A
 language well (oral
 and written)
 D. Professional Attitudes
 1. Seeks ways of improving NC NC A NC NC
 his ability and
 teaching effectiveness
 by professional study
 2. Has high standards of NC A A A/AA A/AA
 ethics in his dealings
 with the profession,
 the
 parents, and the pupils
 3. Displays a willingness NC NC A A/AA A
 and enthusiasm to
 work for the overall
 good of the school
 4. Accepts directions NC A A A/AA A
 and supervision
 
 
 
 [1]
 While this category was not checked, Tripp had crossed out the words "Warm
 and Sincere" and written "Very Low" next to the remaining word "Voice".
 
 
 [2]
 No check, but Tripp wrote in the words "No Fear Here"outside of the
 columns.
 SYMBOLS:
 W: Weak; A: Average; AA: Above Average. The TE's had a fourth category,
 "Outstanding". Plaintiff received no marks in that category.
 W/A or A/AA: Indicates that the checkmark on the TE was placed on the line
 separating the columns.
 ?-A: A question mark instead of a check was placed in the "Average" column.
 ?: A question mark was placed outside of all columns, to the immediate right of
 the "category".
 A/MI: Check in the "Average" column with the notation "Much Improved".
 NC: Category not checked.
 NA: Category did not appear on form used for 10/8/70 TE. That TE form, in
 addition
 to the categories shown, had several more categories which were dropped when
 the TE
 forms were apparently revised. The differences between the 10/8/70 TE form and
 the
 revised form used in the latter four evaluations are not material, and I have
 ignored
 them for ease of discussion.Tripp's Comments on the TE's
 10/8/70: In 'Areas in Which Teacher Needs Help,' Tripp wrote
 
 
 [1]
 Glare on board, a lot of moving about by students
 
 
 [2]
 Room noisy, each child writing a sentence on the board
 
 
 [3]
 Wondering about general control
 11/17/70: In 'Comments':
 Directions for homework inadequate.
 And class instruction on math very weak. . . . Discipline has improved considerably, am wondering about prepreparation (sic).
 2/5/71: 'Comments':
 Classroom much improved in all circumstances.
 4/19/71: 'Comments':
 
 
 [1]
 Amount of preparation--?
 
 
 [2]
 Discipline has improve(d) some but still weak
 
 
 [3]
 Pre-instruction--?
 Plaintiff wrote on the bottom of the TE: 'I was sick today.'
 4/23/71: 'Comments':
 It looks to me as if the students almost run the classroom instead of the teacher. I question the organization, preparation and method of presentation.
 On April 26, 1971, Tripp and the plaintiff had a conference, the substance of which was recorded by Tripp, and signed by him, on the back of the 4/23/71 TE:
 Mrs. Jones and I had a long talk this afternoon. I told her that I did not reconsider her employment at Pactolus next year. In our discussion she brought out she had always been a 6, 7, and 8 grade teacher and that this was her 2nd attempt at the 5th grade level. She also brought out that some of the white parents did not want a black teacher to discipline their child and that they talk about going to court, etc. Mrs. Jones asked me about a recommendation and I told her I would give her one. Mrs. Jones told me she would not be back Tuesday and Wednesday. I told Mrs. Jones that I thought that she should go back to the 7 or 8 grade classroom. Nor did I doubt for a moment that she wasn't a good 7 or 8 grade teacher. Mrs. Jones thinks that I haven't been fair in my judgment. I think I have. There is bound to be some pre-planning, but the carry over is what I can't see. This is why I question.
 
 
 [1]
 The action of the district court on the due process issue is not challenged on this appeal
 
 
 [2]
 Prior to the non-renewal of her teaching contract Miss Jones had earned twenty-four hours of credit toward a graduate degree. Since that time, she has earned a Master of Science degree in Guidance, Personnel and Counseling at Kansas State University
 
 
 [3]
 Although the plaintiff received a below average rating at W. H. Robinson School for the 1968--69 school year, she attended St. Augustine's that summer and received improved ratings for 1969--70
 
 
 [4]
 Keyes v. School District No. 1, Denver Colo., 413 U.S. 189, 209, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1974), quoting from Chambers v. Hendersonville City Board of Education, 364 F.2d 189, 192 (4 Cir. 1966) (en banc)
 
 
 [5]
 Hobson v. Eaton, 399 F.2d 781, 784 n. 2 (6 Cir. 1968)
 
 
 [6]
 See Oburn, et al., v. Shapp et al., 521 F.2d 142, 149 n. 18 (3 Cir. 1975)
 
 
 [7]
 In making his findings of fact the district judge specifically referred to his observations of the demeanor of the witnesses Tripp, James and Alford in determining whether their evaluations of the plaintiff's teaching performance were valid or merely pretextual. Rule 52(a) recognizes the importance of such observations, and they are of more than passing relevance since '(f)indings as to the design, motive and intent with which men act depend peculiarly upon the credit given to witnesses by those who see and hear them.' United States v. Yellow Cab Co., 338 U.S. 338, 341, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949)
 
 
 [8]
 Absence of invidious racial motivation is evidenced by the fact that the high ratings which were accorded to Miss Brown and Ms. Ebron appear to have been based upon the same criteria which had been applied to the plaintiff
 
 
 [9]
 Several circuits subscribe to the proposition that a finding that is supported by substantial evidence cannot be clearly erroneous. However, the cases equating 'substantial evidence' with the 'clearly erroneous' rule have been uniformly criticized. See Wright & Miller, Federal Practice and Procedure: Civil § 2585 at 735. A full and interesting discussion of the subject is found in Judge Lay's concurring opinion in Jackson v. Hartford Acc. & Indem. Co., 422 F.2d 1272, 1275--78 (8 Cir. 1970). While there is language in our opinion in Glasscock v. United States, 323 F.2d 589, 591 (1963), which appears to follow the 'substantial evidence' principle, we think the prevailing rule in this circuit is to the contrary
 
 
 [1]
 PPE means 'Principal's Professional Evaluation.'
 
 
 [2]
 TE means 'Teacher's Evaluation.' Principal Tripp recorded his evaluations on TE's, then his final evaluation on a PPE form